Auckland HOLMES, Plaintiff-Appellee,

v.

UNITED STATES BOARD OF PAROLE and United States Bureau of Prisons, Defendants-Appellants.

No. 76–1012.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1976.

Decided Sept. 10, 1976.

Rehearing and Rehearing En Banc Denied Dec. 28, 1976.

John Marshall Meisburg, Jr., U. S. Dept. of Justice, Washington, D. C., Samuel K. Skinner, U. S. Atty., Chicago, Ill., for defendants-appellants.

Julius Lucius Echeles, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and CAMPBELL, Senior District Judge.[1]

SWYGERT, Circuit Judge.

The question in this appeal is whether a federal prisoner is entitled to procedural due process prior to being labeled a "Special Offender," a designation that results in "special handling" during confinement.[2]

Auckland Holmes, convicted of possession and sale of heroin in the Northern District of Illinois, was sentenced to twenty years in prison. Upon his incarceration at the federal penitentiary in Terre Haute, Indiana, Holmes was classified as a special offender by the Bureau of Prisons pursuant to Bureau of Prisons Policy Statement No. 7900.47. After spending six years at Terre Haute, Holmes was transferred to the Federal Correctional Institution at Lexington, Kentucky, a facility better suited for treatment of Holmes' respiratory condition.

Holmes' sentence was reduced from twenty to twelve years after amendment of the Harrison Act, and he became eligible for parole in 1973. His parole application was denied by the United States Board of Parole en banc in Washington, D.C., and his incarceration was ordered to continue until expiration of his sentence. Holmes appealed this decision within the agency pursuant to 28 C.F.R. § 2.27, but his appeal was denied in May 1975.

The plaintiff then filed a complaint in the district court in August 1975. Jurisdiction was predicated on the Mandamus statute, 28 U.S.C. § 1361, and the Declaratory Judgment statutes, 28 U.S.C. §§ 2201 and 2202.[3]

1. The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

2. 18 U.S.C. § 4081. Classification and treatment of prisoners

The Federal penal and correctional institutions shall be so planned and limited in size as to facilitate the development of an integrated system which will assure the proper classification and segregation of Federal prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions.

The following sections of Bureau of Prisons Policy Statement No. 7900.47 describe the purpose of the Special Offender designation:

DISCUSSION A comparatively small proportion of the inmate population presents special prison management problems, and require special handling. This includes offenders whose offense, background, or activities during or related to confinement suggest the need for especially close supervision to avoid situations which would result in undue adverse public reaction or would represent a threat to a particular inmate, the institution, or the community.

POLICY It is the policy of the Bureau of Prisons to maintain a record of Special Offenders in the Central Office, Washington, D.C. to control the transfer and community activities of inmates who pose special management problems. Inmates who fall into the categories stipulated in this Policy Statement may not be transferred or approved for any community activities without prior approval from the Central Office, Correctional Programs Division.

Policy Statement No. 7900.47 delineates eight categories of Special Offenders. Holmes' classification was made pursuant to category No. 2 which reads:

Offense and Prior Record Cases where official investigative reports show that an offender was involved in sophisticated criminal activity of an organized nature, or was a close or frequent associate of individuals involved in organized criminal activity.

3. 28 U.S.C. § 1361 reads:

Action to compel an officer of the United States to perform his duty

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

28 U.S.C. § 2201 provides:

Creation of remedy

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may

Holmes alleges that his classification as a special offender was arbitrary and capricious and that as a result of the classification the Parole Board denied his parole and furlough and delayed his transfer to the medical facility at Lexington.[4] He also asserts that his demand for a hearing in order to learn upon what evidence the special offender classification was based and to contest that evidence was denied. Furthermore, he alleges he has been a model prisoner and has received favorable reports in his files from prison authorities. He requests the issuance of a writ of mandamus to compel the defendants to remove the classification; to afford him the privileges afforded other prisoners; to give full consideration to his application for parole without considering the special offender classification; and for other appropriate relief. The district court denied the Government's motions for dismissal or in the alternative for change of venue and granted summary judgment for the plaintiff. In addition to holding that due process was required in the procedure by which a person is classified as a special offender, the district court delineated a set of procedures required prior to such a designation. These procedures include: (1) a written notice prior to the designation containing a brief description upon which the contemplated designation is based; (2) the opportunity to have the assistance of retained counsel, to be heard in person, to present witnesses and to confront and cross-examine any witnesses called by either or both defendants; (3) appointment of a hearing officer who does not have personal knowledge upon which the special offender designation is based; (4) written findings by the hearing officer if the officer should determine that a special offender classification is warranted, and submission of such determination and findings to the Bureau of Prisons; and (5) the opportunity for review of the hearing officer's determination that the special offender classification is warranted by the Chief of Classification and Parole at plaintiff's institution of incarceration, by the warden of the institution, and by the Bureau of Prisons.

The court further provided that: (1) the defendants forthwith expunge the special offender classification from all records and files of Holmes maintained by defendants or their institutions; (2) the defendants are enjoined from reclassifying Holmes a special offender without first affording him an administrative hearing as required in the order within thirty days of the decision to so reclassify him; (3) the defendants remove any institutional sanctions attendant to the special offender classification; (4) the defendants afford Holmes all privileges denied him due to his classification; (5) the Board of Parole grant Holmes a new parole hearing at the next session of the Board at his institution following the administrative hearing and review thereof, should the Bureau of Prisons decide to reclassify Holmes; and (6) in the event the Bureau of Prisons does not within thirty days of the court's order indicate an intention to reclassify

declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
28 U.S.C. § 2202 provides:
Further relief
Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.
While the Declaratory Judgment sections do not provide an independent basis of jurisdiction, they do provide an additional remedy once the district court possesses jurisdiction under

another jurisdictional statute. *Thompson v. Groshens,* 475 F.2d 127 (3d Cir. 1972), *cert. denied,* 414 U.S. 825, 94 S.Ct. 127, 38 L.Ed.2d 58.

4. Holmes was transferred to the medical facility in Lexington, Kentucky, shortly after the filing of this lawsuit; therefore, any claim to compel transfer is moot. The delay in processing Holmes' application for transfer is attributable to the procedures described for approving the transfer application and will thus necessarily accompany any request for transfer. The request for declaratory judgment relief, therefore, is not moot. *See Preisser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975), and *Chapman v. Kleindienst,* 507 F.2d 1246 (7th Cir. 1974).

Holmes, the Board grant a new parole hearing within thirty days of the order.

## I

The first question pertains to the appropriateness of a writ of mandamus in this case.[5] The writ, although legal, is controlled by equitable principles, and its issuance is dependent largely upon judicial discretion. The availability of both administrative and judicial remedies must be considered as alternatives to issuance of the writ. *U.S. ex rel. Girard Trust Co. v. Helvering,* 301 U.S. 540, 57 S.Ct. 855, 81 L.Ed. 1272 (1937); *City of Highland Park v. Train,* 519 F.2d 681, 691 (7th Cir. 1975). Such alternative remedies, however, must be "capable of affording full relief as to the very subject matter in question." *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir. 1969).

The Government has argued that Holmes is precluded from mandamus relief because of his failure to allege an exhaustion of prison administrative remedies. Secondly, the Government asserts that prior to seeking mandamus, Holmes should have sought relief by filing a habeas corpus petition to challenge "conditions of his confinement."

Exhaustion of administrative remedies is required prior to the issuance of mandamus relief. *See Beale v. Blount,* 461 F.2d 1133 (5th Cir. 1972). This is consistent with the dictates that mandamus will not issue if an alternative fully adequate remedy exists. In addition, where an administrative decision is involved, exhaustion is more applicable to allow completion of administrative treatment of the particular problem. *See generally McKart v. United States,* 395 U.S. 185, 193–94, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); K. Davis, Administrative Law Treatise §§ 20.01 *et seq.* (3d ed. 1958, 1970 Supp.)[6] When prison administration is involved and fair procedures are available, a prisoner can often obtain expeditious review and relief without the necessity of seeking a remedy through the courts. *Willis v. Ciccone,* 506 F.2d 1011, 1014 (8th Cir. 1974).

This is not a case, however, where a party seeking judicial relief by mandamus bypassed an available administrative procedure, *City of Highland Park, supra,* or truncated the procedure without pursuing the process to its end, *Beale, supra.* True, Holmes did not follow the administrative grievance procedures prescribed by the Bureau of Prisons' policy statement in order to make his demands known to the Bureau. A denial of this demand, however, had already been rendered, not by the first or second party in the review procedure, but by the office which would be the ultimate decision maker in the review procedure.[7] To compel

---

5. The Government challenges both the jurisdiction of the district court over the claim and the appropriateness of granting mandamus relief. Three elements are applicable to test the appropriateness of granting mandamus: a clear right in the plaintiff to the relief sought; a plainly defined and peremptory duty on the part of the defendant to do the act in question; and no other adequate remedy available. *Lovallo v. Froehlke,* 468 F.2d 340, 343 (2d Cir. 1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973). Their coexistence is not a prerequisite for jurisdiction. *See Carter v. Seamans,* 411 F.2d 767, 775 (5th Cir. 1969).

6. Exhaustion also has been required prior to seeking habeas corpus relief. *Willis v. Ciccone,* 506 F.2d 1011 (8th Cir. 1974).

7. The plaintiff's complaint recited that he demanded a hearing before the defendants during which he could learn of and contest the evidence against him upon which his classification was made and that his attorney received a letter from the Bureau of Prisons stating that he would not be given a hearing. The letter to which the complaint refers is signed by the Acting General Counsel of the Bureau of Prisons, although the letter recites that plaintiff's letter demanding a hearing was originally addressed to William Brittain and was referred to the Assistant General Counsel for reply. The letter unequivocally refused Holmes' request for a hearing. The denial itself was based not on the failure of Holmes to follow the prescribed procedure, but was rather founded on the very merits of Holmes' request.

The letter also states that prison officials in Terre Haute, Indiana, were contacted and that the Acting General Counsel was advised that Holmes was receiving adequate medical care. The letter goes on, however, to inform Holmes that the Bureau Central Office had approved Holmes' transfer to a more appropriate facility for medical treatment. Holmes was transferred to the Federal Correctional Institution at Lexington, Kentucky, on August 30, 1975 (four days after he filed this lawsuit) for medical treatment of a respiratory condition.

Holmes to resort to an administrative procedure that terminates with an appeal to a party in the highest level who has already rejected his request "would be to demand a futile act." *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 20 L.Ed.2d 1519 (1968); *U.S. ex rel. Marrero v. Warden,* 483 F.2d 656 (3d Cir. 1973).

■ The Government also argues that mandamus relief is inappropriate because Holmes is attacking his "conditions of confinement" and such an attack may properly be made by habeas corpus.[8] We are not convinced by the Government's reliance on *Preisser v. Rodriquez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), that habeas corpus is available to a federal prisoner attacking the "conditions of confinement." The Court raised more questions regarding the availability of habeas corpus to attack conditions of confinement than it answered. Indeed, there is conflicting dicta in this circuit with respect to this question. *See, e. g., Knell v. Bensinger,* 522 F.2d 720, 726 n. 7 (7th Cir. 1975); *Bryant v. Harris,* 465 F.2d 365, 367 (7th Cir. 1972); *U.S. ex rel. Knight v. Ragen,* 337 F.2d 425 (7th Cir. 1964); *United States v. Kniess,* 251 F.2d 669 (7th Cir. 1958). Assuming, however, that habeas is available, we hold that the district judge did not abuse his discretion in granting mandamus relief. *See Carter v. Seamans,* 411 F.2d at 769.

Under the designation of special offender, Holmes has been compelled to live with a stigma that affects his opportunities for furlough and parole. A transfer or a dismissal by this court without prejudice so that Holmes could file an action under section 2241 would serve only to perpetuate a gross injustice in favor of preserving judicially formulated niceties which are neither required nor jurisdictional. We do not countenance such a result.[9]

In accordance with our position, we note that several other circuits have deemed the mandamus remedy appropriate to challenge conditions of confinement. *Kahane v. Carlson,* 527 F.2d 492 (2d Cir. 1975); *Workman v. Mitchell,* 502 F.2d 1201 (9th Cir. 1974); *Mead v. Parker,* 464 F.2d 1108 (9th Cir. 1972); *Taylor v. Blackwell,* 418 F.2d 199 (5th Cir. 1969); *Barnett v. Rodgers,* 133 U.S.App.D.C. 296, 410 F.2d 995 (1969); *Long v. Parker,* 390 F.2d 816 (3d Cir. 1968); *Toles v. Katzenback,* 385 F.2d 107 (9th Cir. 1967), *vacated,* 392 U.S. 662, 88 S.Ct. 2292, 20 L.Ed.2d 1353 (1968); *Walker v. Blackwell,* 360 F.2d 66 (5th Cir. 1966). Most of these cases were brought in the district of confinement with the warden named as defendant, but we think that mandamus is all the more appropriate in this case because Holmes' attack "is in effect [here] challenging a nationwide policy of the Bureau of Prisons rather than the conditions of confinement in a single penitentiary." *Kahane,* 527 F.2d at 493 n. 1. It is this challenge to national officials which eliminates "[the] spectacle of the warden of a large federal prison being answerable for prison conditions under § 1361 to district judges scattered from Maine to Hawaii and Florida to Alaska . . . ." *Kahane,* 527 F.2d at 496 (Friendly, J., dissenting).

■ The Government further contends that jurisdiction in the district court did not exist because proper venue did not lie under 28 U.S.C. § 1391(e).[10] Holmes' complaint states that he is a resident of Chicago, Illinois, and is presently incarcerated at Terre Haute, Indiana. We see no reason

---

8. The Government moved to transfer this case either to the district of Holmes' incarceration or to Washington, D.C. The basis of the request for transfer to Holmes' district of incarceration was that Holmes' action was actually a habeas corpus suit and was required to be brought where the plaintiff is confined.

9. A transfer or dismissal may indeed be ludicrous in view of the fact that this court would be required to face the same due process issue on appeal from the district court in Indiana.

10. 28 U.S.C. § 1391(e) provides:

A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

for purposes of venue under section 1391 to ascribe to Holmes the residence of his district of incarceration rather than the district of his domicile. Accordingly, we hold that venue existed in the district court under section 1391(e)(4). *Accord, Kahane v. Carlson,* 527 F.2d 492 (2d Cir. 1975); *Ellingsburg v. Connett,* 457 F.2d 240 (5th Cir. 1972).

The Government also urges that jurisdiction in the district court was lacking because mandamus is not an appropriate vehicle to litigate complex constitutional issues. In support of this point, the Government contends that Holmes has demonstrated neither a clear right to the relief sought nor a clear ministerial and preemptory duty on the part of the defendants in this case.

 Constitutional obligations as well as statutory duties are included within the perimeters of 28 U.S.C. § 1361. *See, e. g., Burnett v. Tolson,* 474 F.2d 877 (4th Cir. 1973); *Mead v. Parker,* 464 F.2d 1108 (9th Cir. 1972). In cases charging a violation of constitutional rights, mandamus should be construed liberally. *Richardson v. United States,* 465 F.2d 844, 851 (3d Cir. 1972), *rev'd on other grounds,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). We agree with the Government that this case on its merits presents constitutional issues of a complex nature; however, this fact alone does not affect jurisdiction. We find the statement of the Third Circuit in *Mattern v. Weinberger,* 519 F.2d 150 (3d Cir. 1975), *vacated and remanded on other grounds, sub nom., Mathews v. Mattern,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976), to be applicable to the case at bar:

> The complexity and novelty of the issues *on the merits,* however, do not necessarily deprive the federal courts of mandamus jurisdiction. A determination with respect to jurisdiction involves a threshold inquiry into whether the plaintiff has alleged a cause of action under the particular jurisdictional statute. 519 F.2d at 156. [Emphasis in original.]

 Holmes claims a due process violation in that he has been classified as a special offender without being afforded an opportunity to learn of and contest the evidence against him. His position is that although the grant or denial of a furlough, transfer, and parole are discretionary, his right to due process is violated when prison authorities take account of the special offender classification in making these determinations. Given this fact, he has alleged a clear, ministerial, and nondiscretionary duty. We, therefore, hold that Holmes' allegations were sufficient to establish jurisdiction under the Mandamus statute, 28 U.S.C. § 1361.

## II

 We turn to the question of whether a prisoner has the right to procedural due process prior to his classification.

Although many rights and privileges usually available to the ordinary citizen are not available to prisoners, "an iron curtain is not drawn between prisons of this country and the Constitution," *Cardaropoli v. Norton,* 523 F.2d 990, 992 (2d Cir. 1975). Among those rights available is the right of procedural due process in cases involving certain prison disciplinary proceedings, *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); revocation of parole, *Morrissey v. Brewer,* 408 U.S. 471, 484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); revocation of probation, *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); involuntary transfer of a prisoner to an institution for the criminally insane, *U. S. ex rel. Schuster v. Herold,* 410 F.2d 1071 (2d Cir. 1969); statement of reasons for denial of parole, *U. S. ex rel. Richerson v. Wolff,* 525 F.2d 797 (7th Cir. 1975).

The authority to classify, treat, and transfer a federal prisoner is delegated to the Attorney General. This general power has been redelegated to the Bureau of Prisons. 28 C.F.R. 95(d), 0.96(c). The special offender classification was created by Bureau of Prisons Policy Statement No. 7900.-47 (April 30, 1974). The purpose of the policy statement is to "provide policy guidelines on a system to identify and tabulate information on certain special categories of

offenders who require greater case management supervision than the usual case."

A staff member is assigned by the warden of each prison to coordinate the special offender operation. Institution staff make the initial determination of special offenders based upon "Court records, information from the Central Office, or other reliable information." [11] After a prisoner is determined to be within the special offender category, a copy of the determination is sent to the Central Office in Washington, D. C., for confirmation. At no time is a prisoner afforded a formal notice of his consideration for his classification, nor is he notified of the factual basis for his classification. Although theoretically he may have administrative remedies, it is questionable whether they serve a practical function in view of the fact that the classification has already been approved by those at the top of the review ladder. The court in *Catalano* characterized such review as "at best

these provide merely a review 'on the records.'" *Catalano v. United States*, 383 F.Supp. 346, 349 (D.C.Conn.1974).

We disagree with the Government's contention that the effect of the special offender classification system is only procedural. A special offender may not be transferred or participate in community programs without prior approval from the Central Office, which results in "inordinate delays" compared with other prisoners' ability to personally request such transfers before a prison advisory committee or a caseworker.[12] The resulting delay is particularly burdensome when, as here, the purpose of the request for transfer was to obtain medical treatment.

With respect to furloughs, Bureau of Prisons Policy Statement No. 7300.12c (July 23, 1974) provides that furloughs will ordinarily not be granted for persons identified with large scale criminal activity.[13] In light of the purposes of furlough as set out in the Bureau of Prisons Policy Statement,[14] this restriction may be devas-

**11.** Bureau of Prisons Policy Statement No. 7900.47.

**12.** At oral argument, counsel for the Government informed us that delays often range from one to three months.

**13.** Bureau of Prisons Policy Statement No. 7300.12c provides in pertinent part:

(2) Exceptions—Ordinarily, furloughs will not be granted for persons identified with large scale criminal activity, for offenders convicted of serious crimes against the person, for persons whose presence in the community would attract undue attention or create unusual concern, or for persons obtaining medical or dental treatment not funded by the Bureau of Prisons. Any approvals for these exceptional cases must follow specific guidelines.

(a) all furloughs for persons identified with large scale organized criminal activity must be approved by the Assistant Director, Correctional Programs Division. Each case will be considered on an individual basis. Furlough eligibility will be determined primarily by the degree of involvement in organized criminal activity.

**14.** Bureau of Prisons Policy Statement No. 7300.12c also provides:

3. *REFERENCE*

a. Public Law 93–209, Title 18, Section 4082(c), Paragraph 1, has been amended to read as follows:

The Attorney General may extend the limits of the place of confinement of a prisoner as to whom there is reasonable cause to believe he will honor his trust, by authorizing him, under prescribed conditions to—

(1) visit a specifically designated place or places for a period not to exceed thirty days and return to the same or another institution or facility. An extension of limits may be granted to permit a visit to a dying relative, attendance at the funeral of a relative, the obtaining of medical services not otherwise available, the contacting of prospective employers, the establishment or reestablishment of family and community ties or for any other significant reason consistent with public interest.

4. *POLICY*

a. Furloughs can be an important part of the continuing effort which should be made to prepare offenders for release to the community. Furloughs may be granted by delegated authority, in accordance with the provisions of Title 18, Section 402, amended. Thirty days is the maximum length of time authorized by the statute for furloughs.

c. Offenders granted furloughs remain in the custody of the Attorney General. Furlough time in the community is creditable toward service of the sentence. An offender on furlough who absconds shall be processed as an escapee, and an offender who fails to follow through on the conditions of a furlough will be subject to disciplinary action.

5. *ADMINISTRATION*

tating to the social, moral, and economic rehabilitation of the prisoner and his family.

The special offender classification also affects a prisoner's prospects for release on parole. Those special offenders whose designation is based on participation in organized crime may be designated as "original jurisdiction" cases by the Regional Director of the Board of Parole, 28 C.F.R. § 217(a), (b)(2) (1974). All such applications are submitted to the Board for consideration *en banc.*[15] Although the Board does review the underlying evidence upon which the special offender designation is based, the inmate's opportunity to challenge is the designation at this stage is minimal. *See Cardaropoli v. Norton,* 523 F.2d 990, 994 n. 10 (2d Cir. 1975).

We find it unrealistic to believe that once it has been determined that a prisoner may be the type that is particularly susceptible to involvement in "situations which would result in undue adverse public reaction or would represent a threat to a particular inmate, the institution, or the community,"

consideration is not given to this determination when furlough or transfer is considered. We find it equally untenable to suggest that this prior determination will play no part in the parole decision when the Bureau of Prisons Policy Statement provides that furlough, a far lesser liberty than parole, will ordinarily be denied to such prisoners.

We view the possibilities of furlough, transfer, and parole as cognizable benefits and agree with the Second Circuit that the "Special Offender classification works serious alteration in the inmate's conditions of confinement because it hinders or precludes eligibility for these important rehabilitative programs." *Cardaropoli v. Norton,* 523 F.2d at 995. We hold that such alternation created by the special offender classification constitutes a "grievous loss," *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. 2593; *Miller v. Twomey,* 479 F.2d 701 (7th Cir. 1973), and, therefore, requires the basic elements of due process.

In so holding we reject the Government's argument that, assuming the special of-

a. *Community Relations*
(1) Correctional Managers and staff should promote public understanding of and support for the furlough program by developing and maintaining communications to impart basic information, interpret the aims of furloughs and explain their relationship to the total correctional process. Official and other important segments of the local communities shall also be advised of the continuing progress and modifications of the program.
\* \* \* \* \* \*
b. *Purposes of Furlough*—Furloughs may be granted for such purposes as:
(1) To respond to specific family crisis/emergencies, and/or urgent offender needs, when direct personal interaction appears best suited to the accomplishment of correctional objectives.
(2) To obtain necessary medical-dental treatment which is not otherwise available and is recommended by the Chief Medical Officer/Chief of Health Programs and the Warden. This requires Central Office approval (see 5c(2)(d)) and full documentation.
(3) To participate in completion of release plans, including interviews with prospective employers, school enrollment and obtaining suitable housing.
(4) To participate in special courses of training of 30 calendar days or less when daily

commuting from the institution is not feasible.
(5) To participate in family and selected community educational, social, civic, religious and recreational activities or to establish or reestablish family or community ties when it is determined that such activities will directly facilitate the release transition from institution to the community.
(6) For transfer to another correctional facility, such as a Community Treatment Center or a minimum security camp.
(7) To comply with the legal process of a court of competent jurisdiction, whether state or federal; to appear before a grand jury; to comply with the legal process or official request of a state or federal legislative body; to comply with the legal process or official request of a duly constituted regulatory or licensing agency.
6. *IMPLEMENTATION*
a. Furloughs represent a program through which the offender's alienation from family and community may be minimized. Additionally, performance on furlough provides a reality measure of release readiness.

15. Holmes was designated an "original jurisdiction" case by the Board of Parole pursuant to this section.

fender designation does result in denial of furlough, transfer, or parole, such a result does not require due process because no prisoner possesses a "right" or "entitlement" to these conditions of confinement.[16] This court's recent decision in *U.S. ex rel. Richerson v. Wolff*, 525 F.2d 797 (7th Cir. 1975), supports our rejection of this right/privilege dichotomy. In *Richerson*, we held that due process required that reasons be given for the denial of parole release.[17] At the core of our holding was the idea embodied in our statement in *King v. United States*, 492 F.2d 1337, 1343 (7th Cir. 1975):[18]

> [A] substantial argument can be made that some modicum of due process should attend the denial of the expectation of conditional freedom on parole inasmuch as its termination after having been granted inflicts a "grievous loss" of a "valuable liberty."

It is apparent that we attached due process rights to the denial of parole release, despite the fact that in the Government's view there existed no "right" or "entitlement" to parole. This reasoning is equally applicable to the alteration in an inmate's possibility for obtaining furlough, transfer, or parole as a result of the special offender designation. The court in *Cardaropoli* clearly described the situation: "Preclusion from access to those benefits entails loss as grievous as that occasioned by their revocation, for the inmate's stake remains the same in each instance." 523 F.2d at 995 n. 10.

Our holding here is not inconsistent with the recent cases of *Meachum v. Fano*, —— U.S. ——, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montayne v. Haymes*, —— U.S. ——, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In *Meachum* and *Montayne*, the Court denied the due process claim because no state law or practice conditioned transfer upon the occurrence of specified events. Here, however, the repeated denials and delay in processing Holmes' request for transfer, and his continued commitment in an institution inadequately furnished with medical facilities for treating his respiratory condition violated Holmes' clear right to adequate medical attention.

The nature of Holmes' interest in furlough and parole also differs from the state prisoners' interest in preventing transfer in *Meachum* and *Montayne*. Unlike transfer in which the Court held the prisoners possessed no interest once duly convicted, parole and furlough are held out as rehabilitative programs by the Bureau of Prisons. Guidelines have been promulgated to aid officials in the exercise of their discretion. While there may exist no right to furlough or parole as there exists no right to incarceration in a particular prison, the extension to prisoners by established prison policy of the opportunities of parole and furlough, constitutes a cognizable benefit to prisoners. No such cognizable benefit was bestowed upon the prisoners in *Meachum* or *Montayne* and we do not read those cases to eliminate due process where cognizable benefits have been established by prison policy

---

16. The Government's argument is based on its interpretation of *Roth v. Board of Regents*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). It is clear in light of *U.S. ex rel. Richerson v. Wolff*, 525 F.2d 797 (7th Cir. 1975), that this interpretation is not followed in this circuit. For a discussion of what we believe to be the correct approach to this issue *see Bradford v. Weinstein*, 519 F.2d 728, 731 (4th Cir. 1975), *vacated as moot*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350, and *Cardaropoli, supra* at 995 n.10.

17. *Accord, Childs v. United States Board of Parole*, 167 U.S.App.D.C. 268, 511 F.2d 1270

(1974); *U.S. ex rel. Johnson v. Chairman of New York State Board of Parole*, 500 F.2d 925 (2d Cir. 1974), *vacated as moot*, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289; *Bradford v. Weinstein*, 519 F.2d 728 (4th Cir. 1975), *vacated as moot*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350. *Cf. Scott v. Kentucky Board of Parole* (6th Cir. 1975), *cert. granted*, 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 409; *Brown v. Lundgren*, 528 F.2d 1050 (5th Cir. 1976).

18. In *King*, we held that the Administrative Procedure Act applied to parole release proceedings and required a statement of reasons for denial. The inapplicability of the Act to state prisoners required courts in this and other circuits to deal with the due process clause as requiring reasons for denial.

itself and eligibility for the benefits is precluded or significantly reduced by the occurrence of a specified event, that is, the special offender classification.

## III

Having held that due process attaches to the special offender classification, we turn to those procedures which the district court held necessary to comply with due process. In considering such procedures we are mindful of our task to seek a "mutual accommodation between the institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). We agree with the Government that the district court erred with respect to the right to counsel and the right to confrontation and cross-examination. We affirm the remainder of the prescribed procedures. *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Wolff v. McDonnell, supra.*

The district court provided that an inmate be afforded the right to retained counsel at the special offender hearing. Although it is not certain that the presence of counsel would inevitably give the proceedings a more adversary cast and tend to reduce the utility of the special offender classification as a correctional tool, we are constrained from permitting an absolute right to retained counsel. *Wolff v. McDonnell*, 418 U.S. at 570, 94 S.Ct. 2963. We do, however, agree with the Second Circuit that where the issues are complex or an inmate appears to be unable to collect or present his evidence, retained counsel should be permitted. *Cardaropoli v. Norton*, 523 F.2d at 998.

As to the right to confront and cross-examine the witnesses, we agree with the district court that the hearing officer should retain the discretion to keep the hearing within reasonable limits, to refuse to call witnesses who may create a risk of reprisal or undermine authority, and to limit the inmate's access to other prisoners for the purpose of collecting statements or compiling other documentary evidence. In *Wolff*, the Court discussed those dangers inherent in allowing an inmate to confront and cross-examine witnesses against him in prison disciplinary proceedings. 481 U.S. at 567–68, 94 S.Ct. 2963. Although most witnesses for the prisoner will not be fellow inmates, *see Cardaropoli v. Norton*, 523 F.2d at 998, we nonetheless think that the potentially adverse consequences flowing from the right of confrontation and cross-examination described in *Wolff* would be attendant to a special offender hearing.

In *Wolff* the Court concluded with respect to cross-examination and confrontation that "[T]he better course at this time, in a period where prison practices are diverse and somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons." *Wolff*, 418 U.S. at 569, 94 S.Ct. at 2981. The Court recently reaffirmed this preference in *Baxter v. Palmigiano*, 425 U.S. 308, 322, 96 S.Ct. 1551, 1560, 47 L.Ed.2d 810 (1976): "Mandating confrontation and cross-examination except where prison officials can justify their denial on one or more grounds that appeal to judges, effectively preempts the area that *Wolff* left to the sound discretion of prison officials."

We conclude that the procedure described by the district court possesses characteristics closely related to that procedure rejected in *Baxter* and therefore modify that portion of the order to leave the opportunity to confront and cross-examine witnesses to the sound discretion of prison officials.

As modified, the judgment of the district court is affirmed.